IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ELIZABETH G. GROFF,

                    Plaintiff,

v.                                                    Case No. 13-2356-JTM

PATRICK R. DONAHOE,
Postmaster General,
U.S. Postal Service

                    Defendant.


## MEMORANDUM AND ORDER

This matter arises out of an employment relationship between plaintiff Elizabeth G. Groff and defendant United States Postal Service ("USPS"). Plaintiff claims violations of Title VII of the Civil Rights Act of 1964 ("Title VII") for gender discrimination based on a hostile work environment. Before the court are USPS's Motion for Summary Judgment (Dkt. 37) on all claims and plaintiff's competing Motion for Summary Judgment (Dkt. 39).[1] As discussed below, USPS's motion is granted and plaintiff's motion is denied.

### I. Legal Standard

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." FED. R.

---

[1] USPS moves for summary judgment on all nine discrete claims and hostile work environment. It is unclear whether plaintiff asserts all nine claims discretely. In her response, motion, and reply, plaintiff addresses only vicarious liability without considering the requisite substantive claim of hostile work environment.

CIV. P. 56(a). Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004). "The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party resisting summary judgment may not rely upon mere allegations or denials contained in its pleadings or briefs. *Id.* at 256. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Id.* Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Id.* at 249–50. Once the moving party has carried its burden under Rule 56, the party opposing summary judgment must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (quoting FED. R. CIV. P. 56(e)) (emphasis in *Matsushita*).

## II. Uncontroverted Facts

### A. Background Facts

Plaintiff began working for USPS in 1991. She initially worked in the Kansas City, Kansas, Post Office and transferred to the Shawnee Mission Post Office in September 2004 where she worked as a Laborer Custodian, grade level 4. The Shawnee Mission Post Office operates a number of separate facilities ("the Shawnee Mission cluster"). The main Shawnee Mission post office ("Shawnee Mission Main") was plaintiff's duty station.

Plaintiff worked "on and off" as a backup secretary for Shawnee Mission Postmaster Russ Jacobson until May 2005. She then served two 90-day details[2] at a Mid-District office in Kansas City, Missouri, during 2005 and 2006. Upon plaintiff's return from the second detail in 2006, Jacobson requested that she again serve as a backup secretary for him, but she declined.

Aaron Holder, Maintenance Supervisor at Shawnee Mission Main, was plaintiff's first-line supervisor from August 2007 until at least October 2009. Bennie Ellington, Maintenance Manager at Shawnee Mission, was plaintiff's second-level supervisor from approximately 2005 to 2010. Ellington answered to Jacobson. According to plaintiff, Ellington would "kind of hang out in the break room with the guys and talk about – talk about things with them more." (Dkt. 48-2, at 224). She also thought he felt more comfortable around the men than around her and that he seemed like "one of the guys." *Id.*, at 224-25.

---

[2] A detail is a temporary duty assignment within USPS.

Plaintiff retired from the USPS on January 31, 2013.

**B. Discreet Claims of Gender Discrimination**

On April 16, 2010, plaintiff contacted an Equal Employment Opportunity Counselor ("EEOC") regarding the following gender discrimination claims. Plaintiff did not pursue an administrative remedy for any of her complaints before her April 2010 complaint.

*1. Ellington denied plaintiff's request to serve as backup for the Level 7 Maintenance Operations Support Clerk ("MOS Clerk").*

When plaintiff arrived at Shawnee Mission Main, the location employed a Maintenance Operations Support Clerk Level 5 ("MOS Clerk 5") and a MOS Clerk 6. Through contract negotiations, those positions became Level 6 and Level 7, respectively. The MOS Clerk 6 could perform some duties of the MOS Clerk 7 in the latter's absence without serving as the backup to the Level 7 position. At that time, Bruce Orner – a man – was the MOS Clerk 6 and Teena Simmons – a woman – was the MOS Clerk 7.

Ellington assigned backup duties according to the employee promotion register. Dan Kellogg was first on the register for promotion to the Level 6 MOS Clerk and plaintiff was second. Orner was first on the Level 7 MOS Clerk register, while Kellogg was second and plaintiff was third. In late fall of 2008, Ellington assigned plaintiff backup duties for the MOS Clerk 6, but not the MOS Clerk 7.

Maintenance Mechanics ("Mechanics") occasionally performed some of the MOS Clerk 7 duties, such as running certain reports. Such reports were part of the Mechanics'

duties that overlapped with the MOS Clerk 7's duties. Mechanics did not receive extra wages for performing such duties and did not serve as the MOS Clerk 7 backup.

The MOS Clerk 7's duties included ordering supplies. A portion of the supply ordering required use of a company credit card ("Impact card"). Simmons was the only Impact card holder for Maintenance at the time.

Plaintiff requested to serve as the MOS Clerk 7 backup. Ellington denied the request, citing the fact that plaintiff did not have authorization to use the Impact card, which was required for the position. Nobody from the MOS Clerk 6 or MOS Clerk 7 promotion register ever served as the MOS Clerk 7 backup to Simmons.

### 2. Holder assigned plaintiff outside and dock route duties year-round.

Plaintiff began performing the outside route and dock route regularly in 2006. At that time, Mike Fisher was her supervisor and only one person performed those routes. When Holder became her supervisor in 2007, plaintiff continued the outside route and dock route under Holder. She described Holder as a "pretty laid back guy" who didn't want to "rock the boat." (Dkt. 48-2, at 97). Holder eventually changed the Maintenance routes. The moves caused a lot of grumbling among the workers. Holder then returned plaintiff to the outside and dock routes.

Plaintiff's duties on the outside route included removing snow from entrances, sidewalks, and steps – either manually or with a gas-powered plow. Mechanics operated plow trucks to clear parking lots and other areas. When plaintiff told Holder that she needed help with snow removal, he sent either Adela Vazquez or Christine Clayton to help unless a male volunteered.

Certain weekend-shift male custodians did not remove snow if no supervisor was present to assign them to do the work. One of the Mechanics occasionally removed snow on the weekends. The weekday shift – plaintiff's shift – removed snow left by the weekend custodians. Plaintiff thought that the weekend custodians refused to remove snow to avoid work and that they "were not motivated workers by any means." (Dkt. 48-2, at 106). She also thought that Clayton, Vasquez, and Eva Ayalla – women who worked in Maintenance – were more likely to do what they were supposed to do than most of the men. (Dkt. 48-2, at 109).

After plaintiff transferred from Shawnee Mission Main to the Blue Valley location, the outside and dock routes were assigned to at least six men and one woman.

### 3. Plaintiff did not receive a transfer to the Gardner, Kansas, Post Office.

In January 2007, plaintiff submitted an electronic request to transfer to a position in the Clerk Craft in Gardner if such a position became available. Among her motivations for requesting the transfer was that she lived in Gardner and would save money on gas. Plaintiff renewed the request annually until November 2011.

Plaintiff believed that the selection for such transfers would be given on a first-come-first-served basis. Any transfer would be conditional on a subsequent supervisory evaluation by Ellington. Plaintiff was not transferred to Gardner.

Plaintiff made no other requests to transfer to other post offices during her time at the Shawnee Mission Post Office.

*4. Jacobson denied plaintiff a detail at the Bulk Mail Center in Summer 2008.*

In summer 2008, Jeff Monteil, Maintenance Manager of the Bulk Mail Center in Kansas City, Kansas, selected plaintiff for a detail to the position of Clerk Stenographer at the Bulk Mail Center. Plaintiff was very interested in the detail, and Ellington had no objections.

After conferring with Ellington, Jacobson denied the detail, citing a staff shortage leading up to a major safety audit. Maintenance personnel performed duties indirectly related to the safety audit. Plaintiff suspected that the denial was related to her refusal to serve as Jacobson's backup secretary in 2006.

*5. Plaintiff did not receive increased pay for operating a riding lawn mower.*

Plaintiff operated a riding lawn mower at the Shawnee Mission Post Office. While certain other male employees had received higher-level pay for operating riding lawn mowers since 2005, plaintiff did not. Ellington and Holder told plaintiff that she was not eligible for the higher-level pay because she did not operate a commercial mower.

The union craft director spoke with Ellington about the issue. In approximately March 2009, Ellington told plaintiff that she could receive higher pay if she submitted a Form 13 for hours she used the riding mower. [3] Plaintiff thereafter received higher pay when she submitted a Form 13.

As of 2009, all Shawnee Mission station and branch custodians – with the exception of Rita Troutman at the Lenexa branch – received higher pay for using riding

---

[3] Form 13 is a request submitted by the employee.

mowers by submitting Form 13. After transferring to Blue Valley, plaintiff continued to receive higher pay for using a riding lawn mower by documenting her hours in written form.

*6. Ellington required plaintiff to make a written request for the duty status of "routes as assigned" in October 2009.*

In October 2009, Holder called a meeting of the custodians at Shawnee Mission main to discuss assigning each an extra task regarding bathroom cleaning. Custodian John Johnson became angry. He began cursing and yelling at Holder. Plaintiff told Johnson to calm down. Enraged, Johnson threw a chair or trash can. Johnson also yelled at plaintiff and called her names. Johnson had never before directed a verbal attack at plaintiff. In an effort to calm the situation, plaintiff volunteered to clean the largest bathroom. Holder waited for Johnson to calm down without intervening.

Plaintiff testified that, several days later, she passed Johnson in the hall and he again "spouted off" at her. Holder and Ellington were in an office down the hall and did not intervene.

Soon thereafter, plaintiff requested that Ellington assign her work at Blue Valley. He asked her to make the request on a Form 13, which she completed on October 22, 2009. Plaintiff also reviewed and signed a Form 1723 to secure assignment to Blue Valley on a Voluntary Detail. [4] Filling out Form 13 and reviewing and signing Form 1723 took plaintiff a couple of minutes.

---

[4] Form 1723 is an assignment order form filled out by the employer.

In November, plaintiff bid for and received a permanent position at Blue Valley. She got on well with her co-workers at Blue Valley.

### 7. Holder showed plaintiff a housekeeping inspection report in March 2010.

In March 2010, Holder performed a housekeeping inspection at Blue Valley and prepared an inspection report.  On or about March 12, 2010, Holder showed plaintiff the report. Three areas were rated unsatisfactorily: the tiles under urinals were stained, some glass block windows were not properly cleaned, and the station manager's office was not properly dusted. Similar inspections performed at eleven other locations within the Shawnee Mission cluster that month reported from three to greater than five unsatisfactory housekeeping areas per location.

The Postal Service's Maintenance Handbook, MS-47, describes the proper use of the housekeeping inspection report. It states that "[c]orrective action as necessary will be taken to eliminate the problems." (Dkt. 38-14, at 4). However, "[t]he results of these inspections will not be used to indicate poor performance on the part of an employee." *Id.*

In her EEOC complaint, plaintiff alleged that Holder's use of the report was intended to indicate poor performance.

### 8. Plaintiff did not receive a transfer to the Brookridge Station in March 2010.

The Brookridge post office is part of the Shawnee Mission cluster. Before a custodian at Brookridge retired in late July 2009, plaintiff told Ellington that she was interested in that position. Ellington believed that the dimensions of Breckenridge did not warrant a Postal Service custodial position and that the position should expire with

the incumbent's retirement. After the incumbent retired, Ellington abolished the position and contracted the custodial services.

The union filed a grievance in September 2009 arguing that a full-time USPS employee should fill the position. Ellington and a union representative then measured the dimensions of the Brookridge facility. The measurements justified a Postal Service custodian position.  Accordingly, the grievance was settled and Ellington submitted a new staffing package for Brookridge in October 2009.

The union filed a noncompliance grievance on November 25, 2009, because USPS had not yet resolved the Brookridge staffing issue. At the time, Ellington's staffing package was awaiting approval from the Western Area Maintenance Manager in Denver.

The Brookridge position was posted in February 2010 and went unfilled. It was re-posted in March 2010 and filled by Donald Schleicher, an Electronics Technician who had been excessed to the Kansas City, Missouri, Post Office from October 9, 2009, until February 26, 2010. Schleicher was not qualified to take the position when it was posted in February because he had been excessed out of Shawnee Mission. Schleicher became the senior bidder for the position upon his return to Shawnee Mission in late February.

Plaintiff filed an EEOC complaint on April 16, 2010.

*9. Ellington reassigned John Johnson to Blue Valley in April 2010.*

Plaintiff had been reassigned to one of two open custodian positions at Blue Valley in October 2009. The second position remained open for lack of bidders. Adela Vasquez volunteered to help at Blue Valley by performing overtime "out-of-schedule"

work until the second position filled. When the union learned of Vasquez's assignment, it instructed Ellington to expand the availability of the out-of-schedule Blue Valley coverage to other Shawnee Mission custodians based on seniority. The coverage was then made available to volunteers based on seniority.

John Johnson was the most senior volunteer for the Blue Valley coverage. On April 12, 2010, Johnson replaced Vasquez at Blue Valley. Plaintiff protested to Holder and Bill Miller, the Blue Valley station manager because of Johnson's prior actions. Nevertheless, custodial duties were split between plaintiff and Johnson. Plaintiff and Johnson worked at Blue Valley without incident.

### III. Analysis

As stated in the Pretrial Order, plaintiff asserts a claim for an unlawful hostile work environment supported by nine discrete claims framed as harassment or disparate treatment. (Dkt. 35, at 7-14). Plaintiff argues that USPS is vicariously liable for Holder and Ellington's actions because they are acts of harassment culminating in tangible employment action. (Dkt. 53, at 2).

**A. USPS is not vicariously liable for gender discrimination unless plaintiff proves a predicate Title VII violation.**

As a preliminary matter, the court addresses plaintiff's vicarious liability argument. Plaintiff argues that, under *Burlington Ins., Inc. v. Ellerth*, 524 U.S. 742 (1998), an employer is vicariously liable for any act of harassment by a supervisor culminating in tangible employment action. In apparent reliance on *Ellerth*, plaintiff fails to address in detail the unlawfulness of the alleged discrimination underlying her Title VII claims.

However, under *Ellerth*, an employer is liable only for a predicate Title VII violation by a supervisor. 524 U.S. 742, 753-54. That is, plaintiff must still prove *unlawful* discrimination under Title VII. The court therefore addresses the substance of each discrete claim and the hostile work environment claim in turn before determining USPS's liability.

**B. Plaintiff failed to exhaust her administrative remedies on discrete claims 1-6.**

"Exhaustion of administrative remedies is a jurisdictional prerequisite to suit under Title VII." *Jones v. Runyon*, 91 F.3d 1398, 1399 (10th Cir. 1996) (quotation omitted). "[E]ach discrete incident of alleged discrimination . . . constitutes its own unlawful employment practice for which administrative remedies must be exhausted." *Jones v. UPS, Inc.*, 502 F.3d 1176, 1186 (10th Cir. 2007). Administrative exhaustion requires the plaintiff to (1) file an administrative charge alleging facts that underlie the discriminatory actions in each claim, where such facts would be within the scope of an administrative investigation that would reasonably be expected to follow such charges, and (2) timely submit the administrative charge. *Green v. Donahoe*, 760 F.3d 1135, 1140 (10th Cir. 2014). Administrative charges must be filed with the EEOC within 180 days, or with a State or local agency with authority to provide relief within 300 days, after the day the discrete discriminatory act happened. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109-110 (2002); 42 U.S.C. § 2000e-5(e)(1).

The timely filing of charges is not jurisdictional in nature and may be subject to equitable tolling. *Morgan*, 536 U.S. at 113. In the Tenth Circuit, equitable tolling generally applies to Title VII periods of limitation only where "circumstances rise to the

level of active deception which might invoke the powers of equity to toll the limitations period." *Montoya v. Chao*, 296 F.3d 952, 957 (10th Cir. 2002). Equitable tolling may be appropriate where a plaintiff has been lulled into inaction by an employer's "deliberate design . . . or actions that the employer should unmistakably have understood would cause the employee to delay filing his charge." *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994).

Plaintiff does not dispute that administrative claims were not timely filed for discrete claims 1-6. No evidence indicates that USPS lulled her into inaction or otherwise induced her delay in filing. Therefore, claims 1-6 are barred for failure to exhaust administrative remedy and will not be subject to equitable tolling; they will not be considered discretely in this action.  Only Claims 7-9 will be analyzed as discrete acts of gender discrimination.

However, "[h]ostile environment claims are different in kind from discrete acts" claims because "[t]heir very nature involves repeated conduct." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). Hostile environment claims are based on the cumulative effect of discrete acts, occurring over a period of days or years, where "[t]he 'unlawful employment practice' cannot be said to occur on any particular day." *Id.*

Thus, a hostile environment claim is timely filed if any contributing act occurs within the filing period; that some component acts of the claim fall outside the timing requirement does not preclude their inclusion in the charge. *Id.* "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the

hostile environment may be considered by a court for the purposes of determining liability." *Id.*

Plaintiff timely filed her EEOC claim regarding a hostile work environment in April of 2010. Therefore, any contributing acts falling outside the timely filing period, including claims 1-6, will be considered for her hostile work environment claim.

## C. Discrete Claims of Intentional Discrimination (Claims 7-9)

It is unlawful "to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, or conditions of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Title VII actions alleging intentional discrimination, such as this case, are known as "disparate treatment" cases. *Ricci v. DeStafano*, 557 U.S. 557, 577 (2009). In a disparate treatment action under Title VII for gender discrimination, a plaintiff must show: (1) she suffered a tangible employment action, (2) she was qualified for the position at issue, (3) she was treated less favorably than others because of her sex, and (4) the action was motivated by discriminatory intent. *Id.*; *Sanchez v. Denver Public Schools*, 164 F.3d 527, 531 (10th Cir. 1998).

A tangible action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); *accord Sanchez*, 164 F.3d at 532 (referring to the same as an "adverse employment action"). Whether an action is a tangible employment action is determined on a "case-by-case approach" by examining the circumstances of each case. *Sanchez*, 164

F.3d at 532. "[A] mere inconvenience or an alteration of job responsibilities" is not a tangible employment action. *Id.*

In the absence of direct evidence of discriminatory intent, as here, a Title VII violation may be proved with circumstantial evidence by employing the three-step burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, the plaintiff must first establish a prima facie case of discrimination; the employer must then identify legitimate, nondiscriminatory reasons for its action; the plaintiff must finally establish that the employer's articulated legitimate reason was a pretext to mask unlawful discrimination. 411 U.S. at 802-04. A plaintiff may prove discriminatory intent by showing that "the challenged action took place under circumstances giving rise to an inference of discrimination." *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007).

Plaintiff asserts nine discrete claims of disparate treatment. As discussed above, claims 1-6 will not be considered discretely because plaintiff failed to exhaust her administrative remedies regarding those claims.

### 1. USPS is not liable on discreet claims 7 and 9.

Plaintiff concedes that Claims 7 and 9 did not involve a tangible employment action. (Dkt. 49, at 51, 55). Accordingly, she fails to make a prima facie case for disparate treatment regarding the housekeeping report and the reassignment of John Johnson. Summary judgment is proper in favor of defendant on discrete Claims 7 and 9.

### 2. USPS is not liable on discreet claim 8.

Plaintiff argues that she suffered a tangible employment action when USPS management failed to post the Brookridge position until late February 2010 because she would have been the senior bidder for the position when the incumbent retired in August 2009. She argues that management intentionally delayed the position to preserve it for Schleicher. This claim is best characterized as one for failure to hire or promote.

To prove a prima facie case of failure to promote, plaintiff must show that: "(1) she was a member of a protected class; (2) she applied for and was qualified for the position; (3) despite being qualified, she was rejected; and (4) after she was rejected, the position was filled by someone outside the protected class." *MacKenzie v. City and Cnty. of Denver*, 414 F.3d 1266, 1278 (10th Cir. 2005) (failure to promote). [5]

Although plaintiff expressed interest in the Brookridge position before it was available, she did not apply for the position when it first opened from February 13 to February 22, 2010 – before Schleicher was eligible to apply for the position. Plaintiff did not apply for the position thereafter. She was therefore never rejected for the position and cannot prove a prima facie case.

It is disputed whether Ellington's motivation for delaying the Brookridge position was to prevent plaintiff from taking the position because of her gender.

---

[5] In the Tenth Circuit, the elements of a failure to hire claim are the same as those for a failure to promote claim. *See Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 982-83 (10th Cir. 2008).

However, this fact will not affect the outcome of this claim because plaintiff otherwise fails to establish a prima facie case.

It is also disputed whether the position could have been posted in August 2009. This fact is also immaterial because the court is unaware of authority identifying an employer or supervisor's decision not to make a position available as a tangible employment action.

Summary judgment in favor of USPS is proper on all of plaintiff's discrete claims.

## C. Hostile Work Environment Harassment Claim

Although Title VII "addresses specific employment decisions with immediate consequences, the scope of the prohibition is not limited to economic or tangible discrimination." *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (10th Cir. 1998). The statute "covers more than terms and conditions in the narrow contractual sense." *Id.* at 786. The language of Title VII "evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation and citations omitted) (referring to the phrase "terms, conditions, or privileges of employment").

To prevail on a "hostile work environment" gender harassment claim, a plaintiff must prove (1) that "the workplace was permeated with discriminatory intimidation, ridicule, and insult, that was sufficiently severe or pervasive enough to alter the conditions of her employment and create an abusive working environment" and (2) that she was "targeted for harassment because of her gender." *Bertsch v. Overstock.com*, 684

F.3d 1023, 1027 (10th Cir. 2012); *accord Harris*, 510 U.S. at 21. The resulting work environment must be "both objectively and subjectively hostile or abusive." *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012) (quotation omitted); *accord Harris*, 510 U.S. at 21 (discriminatory conduct must be so severe or pervasive that a reasonable person would find the work environment hostile or abusive). The conduct must be objectively perceived as abusive or hostile in the context of plaintiff's employment setting. *Morris*, 666 F.3d at 668.

In assessing the objective severity of the harassment, the court will consider a totality of the circumstances, "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002). Facially gender-neutral abusive conduct can support a gender-based hostile environment claim only when "viewed in the context of other, overtly gender-discriminatory conduct." *O'Shea v. Yellow Technology Servs., Inc.*, 185 F.3d 1093, 1102 (10th Cir. 1999).

Plaintiff argues that the nine claims set forth above were instances of discriminatory conduct contributing to an abusive work environment. However, no facts suggest that *any* of the conduct in question was motivated by plaintiff's gender. All nine claims contain gender-neutral facts and therefore should not be considered as contributing to a gender-based hostile work environment claim in the absence of "other, overtly gender-discriminatory conduct." *O'Shea*, 185 F.3d at 1102. Accordingly, plaintiff

18

fails to establish a prima facie case of a gender-discriminatory hostile work environment.

Moreover, Johnson's outburst at plaintiff is the only conduct within her allegations that could be reasonably characterized as subjecting her to intimidation, insult, or ridicule. However, Johnson's conduct is not at issue in this claim. In connection with Johnson's conduct, plaintiff alleges that Holder and Ellington contributed to a hostile environment by requiring her to unnecessarily complete both a Form 13 and a Form 1723. The forms in question are brief and did not unreasonably interfere with plaintiff's work performance; neither was filling out the two forms humiliating, physically threatening, or a frequent occurrence. The conduct in question is not objectively abusive or hostile.

The balance of plaintiff's claims likewise fail to contribute to a hostile work environment. While plaintiff may have experienced some inconvenience or unfortunate circumstances, Title VII does not guarantee a happy workplace. *See Trujillo v. Univ. Colo. Health Sciences Ctr.*, 157 F.3d 1211, 1214 (10th Cir. 1998). The circumstances here do not demonstrate intimidation, ridicule, or insult directed at plaintiff. Finally, the nine events span a timeframe from late 2008 until early 2010, contributing little to a hostile environment in terms of frequency. Accordingly, summary judgment is granted in favor of defendant on plaintiff's hostile work environment claim.

IT IS ACCORDINGLY ORDERED this 14th day of July, 2015, that USPS's Motion for Summary Judgment (Dkt. 37) is GRANTED and plaintiff's Motion (Dkt. 39) is DENIED.

s\ J. Thomas Marten
J. THOMAS MARTEN, CHIEF JUDGE